## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**BACK COUNTRY HORSEMEN OF**                )
**AMERICA,**                                                  )
)
**Plaintiff,**                            )
)
**v.**                              )
)
**MIKE JOHANNS, in his official capacity**        )
**as Secretary of the United States**               )   **Civil Action No. 05-0960 (ESH)**
**Department of Agriculture, the UNITED**       )
**STATES DEPARTMENT OF**                       )
**AGRICULTURE, DALE BOSWORTH, in**      )
**his official capacity as Chief of the United**     )
**States Forest Service; and the UNITED**        )
**STATES FOREST SERVICE,**                      )
)
**Defendants.**                        )
_____ )

### MEMORANDUM OPINION

This case involves a challenge under the Administrative Procedure Act, 5 U.S.C. §§ 551

*et seq.*, to a change in the way the United States Forest Service ("Forest Service" or "agency")

classifies trails within the National Forest System.  Plaintiff Back Country Horsemen of America

("BCHA") claims that the revision, which was implemented without formal public participation,

violated Sections 6 and 14 of the National Forest Management Act ("NFMA"), Pub. L. No.

94-588, 90 Stat. 2949 (codified as amended at 16 U.S.C. §§ 1604, 1612), and the National

Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  Currently before the

Court are the parties cross-motions for summary judgment.  Because the Court finds that the

Forest Service failed to provide for public notice and comment as required by 16 U.S.C. § 1612,

1

but complied with NEPA, it will grant each party's motion for summary judgment in part and

remand the case to the agency for further proceedings.

## BACKGROUND

The Forest Service manages roughly 192 million acres of land within the National Forest

System ("NFS"). 68 Fed. Reg. 33582 (June 4, 2003). Approximately 133,000 miles of NFS

trails are maintained by the Forest Service and available for use by the public. 70 Fed. Reg.

68264 (Nov. 9, 2005). Before the revision at issue in this case, the Forest Service's Trail

Classification System ("TCS") identified trails as Primary/Mainline, Secondary and Way. (AR

1326.) In addition, the Forest Service assigned one of three difficulty levels to each of its trails:

most difficult, more difficult, and easiest. (AR 11.) The difficulty levels were defined generally

in the Forest Service Manual ("FSM"). (AR 11.) In addition, the Forest Service Handbook

("FSH") sets out specific physical parameters for each difficulty level, including maximum pitch

grade and length, clearing width and height, tread width and surface. (AR 63-65.) According to

the agency, these two three-category classification systems did not correlate precisely with each

other. (Fed. Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. and Mem. in Supp. of its Cross-

Motion for Summ. J. ("Def.'s Mot.") at 4.) That is, any trail class could, in theory, be rated any

difficulty level.

Since the early 1990's the Forest Service has been working to improve its management of

information related to the national trail system. (AR 1353.) In 1994, the Forest Service added a

"trails module" to its national database ("Infra") to collect information regarding the condition of

its trail inventory nationwide. (Def.'s Mot. at 4.) In 1997, the Forest Service implemented

Meaningful Measures ("MM"), a spreadsheet designed to apply "business management principles

2

to recreation [management]."  (AR 696.)  MM is a "project and site-level management system" (AR 697) that tracks the costs of maintaining agency facilities, including trails.  (AR 1353.)  Infra and MM were intended to compliment one another: "Data contained in [Infra] should speak primarily to the facilities on the ground for trails," while "[a]ny qualitative assessments or costing should . . . be done through Meaningful Measures."  (AR 170.)  The agency found, however, that information gathered through Infra and MM was not always readily integrated (AR 666-71, 695-96) , making it difficult to gather "consistent, uniform data on real property inventory, condition of facilities, program priorities, and budget needs."  (AR 1353.)[1]

To remedy this problem, in 1998 the Forest Service began developing a five class trail system to replace the existing way, secondary and mainline trail system.  (AR 172-75.)  The new trail class system was incorporated into MM in 1999 and served to "stratify the Trail System for various projects including INFRA inventory, Forest Planning Objectives, Visitor Information, and helping to establish coefficients for MM costing."  (AR 1813.)  In 2000, the agency formed the Trails Development Team ("TDT") to further refine the new trail class system.  (AR 3.) The TDT introduced five "trail fundamentals" – (1) trail class, (2) trail type, (3) managed use, (4) designed use and (5) design parameters – "as cornerstones of Forest Service trail planning and management."  (AR 83.)  Integrated into Infra and MM, these concepts, while "not entirely new, . . . provide an updated and expanded means to consistently record and communicate the

[1] For example, as noted *supra*, despite substantial overlap, the agency's trail classifications (mainline, secondary and way) did not correlate exactly with the trail difficulty designations (easiest, more difficult, most difficult).  (*See* AR 168 ("Most often, the standards prescribed for Mainline trails are those defined for 'Easiest,' . . . however some are 'More Difficult.'").)  Additionally, confusion among field workers between "trail maintenance levels and trail class" undermined the reliability of data collected through Infra for MM's cost analysis purposes.  (AR 170.)

intended design and management guidelines for trail design, construction, maintenance and use."
(AR 83.)

The five class trail system, which remains in effect today, is as follows: Trail Class 1 –
Minimal/Undeveloped; Trail Class 2 – Simple/Minor Development; Trail Class 3 –
Developed/Improved; Trail Class 4 – Highly Developed; and Trail Class 5 – Fully Developed.
The new trail classes are assigned to existing trails according to the current physical
characteristics of the trail. (AR 81.) Relevant physical characteristics include tread and traffic
flow, obstacles, constructed features and trail elements, signs, and typical recreation environs and
experience. (AR 87-88.) The trail class matrix also includes additional criteria specific to pack
and saddle trails. (AR 89.) Designation of a trail class is made "by local managers at the trail-
specific level." (AR 88.) Though the physical characteristics found in the trail class matrix (AR
87-92) "help[] guide the trail manager's decision-making process" (AR 81), local managers may
take into account "Forest Plan direction and other considerations" when assigning a trail class.
(AR 88.) Furthermore, the proper trail classification is intertwined with the managed and
designed use of the trail under the Forest Plan.[2] (AR 81 ("There is a direct relationship between
Trail Class and Managed Use . . . and one cannot be determined without consideration of the
other.").) Local managers are instructed to "choose the [trail class] that most closely matches the

_____

[2] The managed uses of a trail are the "mode(s) of travel that are <u>actively</u> managed and
appropriate, considering the design and management of the trail." (AR 85 (emphasis in
original).) Thus, there may be more than one "managed use" for any given trail. (AR 85.) In
contrast, the "designed use" of a trail is the single managed use that "determines the technical
specifications for the trail." (AR 85.) Typically, the designed use is the managed use that
"requires the highest level of development." (AR 85.) The managed and designed uses of a trail
are established "by individual forest staffs . . . with the public's active assistance," and any
changes require " a public involvement process in land management planning determinations,
including appropriate [NEPA] review." (AR 165.)

managed objective of the trail." (AR 84, 128, 165; *see also* AR 1540.) Once a trail class has been assigned, consistent with the managed and designed uses of the trail, the design parameters which correlate to the assigned trail class provide trail managers with "technical specifications for trail construction and maintenance." (AR 86, 1552, 1699.) The new design parameters issued in 2004 replaced the prior technical specifications linked to difficulty level. (Def.'s Resp. to Pl.'s Statement of Material Facts ¶¶ 9, 23.) Thus, according to the agency, the new trail classification system provides a uniform, objective, and integrated system of information management to guide trail design, construction and maintenance based on the Forest Plan in place at the trail-specific level. (AR 130.)

It is undisputed that the Forest Service did not provide for any formal public participation in the creation of the new trail classification system. (Def.'s Answer ¶ 21.) The Forest Service's failure to do so lies at the heart of BCHA's complaint. BCHA alleges that the agency violated provisions of NFMA that require an agency to solicit and consider public comment in certain circumstances and failed to comply with NEPA. (Pl.'s Mot for Summ. J. ("Pl.'s Mot.") at 6-7.) At issue for the Court is whether any of the statutory preconditions mandating formal notice and comment under NFMA were triggered by the Forest Service's development and implementation of a new trail classification system and whether the implementation of the new trail classification system imposed any obligations on the agency under NEPA.

## ANALYSIS

### I.     Standard of Review

Because neither NFMA nor NEPA creates a private right of action, *see Town of Stratford, Conn. v. F.A.A.*, 285 F.3d 84, 88 (D.C. Cir. 2002); 16 U.S.C. §§ 5401-5409, BCHA relies on the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, to bring its claim.  Even though

the motions currently pending before the Court are styled as Motions for Summary Judgment,

when the Court considers a challenge to agency action the proper standard of review is that found

at 5 U.S.C. § 706 rather than Rule 56 of the Federal Rules of Civil Procedure.  *See Defenders of*

*Wildlife v. Babbitt*, 130 F. Supp.2d 121, 124 (D.D.C. 2001).  Therefore, the Court will uphold the

agency's action unless it finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A).  In making that determination, the Court "is

not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park*

*v. Volpe*, 401 U.S. 402, 416 (1971).  Nevertheless, the Court must consider "whether the agency

acted within the scope of its legal authority, whether the agency has explained its decision,

whether the facts on which the agency purports to have relied have some basis in the record, and

whether the agency considered the relevant factors."  *Fund for Animals v. Babbitt*, 903 F. Supp.

96, 105 (D.D.C. 1995).

## II.     Ripeness

As a preliminary matter, the agency contends that BCHA's claims are not yet ripe for

review.  The ripeness requirement serves "to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 148-49 (1967).  In support the agency cites *Ohio Forestry Ass'n v. Sierra*

*Club*, 523 U.S. 726 (1998), in which the Supreme Court reviewed a challenge to a Land and

Resource Management Plan ("Plan") for Wayne National Forest in Ohio.  The Supreme Court

enunciated a three part test for determining "whether an agency's decision is, or is not, ripe for judicial review," *Ohio Forestry*, 523 U.S. at 733: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.*  Plaintiffs in *Ohio Forestry* alleged that the Plan erroneously "favor[ed] logging and clearcutting" in violation of NFMA.  *Id.* at 731.  The Supreme Court, however, found the claims in *Ohio Forestry* to be premature because the Plan did not itself authorize logging or clearcutting within Wayne National Forest.  Rather, before the agency could issue a logging permit, it had to engage in a series of steps that included conducting an environmental analysis pursuant to NEPA and providing notice and opportunity to comment to those affected by the proposed logging**.**  *Id.* at 730, 734.  For this reason, the Court found the possibility that the agency's policy would undergo "further consideration . . . before . . . implement[ation] is not theoretical, but real."  *Id.* at 735.

   *Ohio Forestry* differs from the instant case in several meaningful respects.  First, *Ohio Forestry* involved a challenge to the substance of a land and resource management plan, which, it is significant to note, was developed subject to notice and comment proceedings.  *See* 16 U.S.C. § 1604(d).  Here plaintiff mounts a procedural challenge to the agency's failure to engage in notice and comment.  If plaintiff's opportunity to comment has been improperly denied, then delaying review will impose a substantial hardship by failing to vindicate plaintiff's procedural right.  Second, in *Ohio Forestry*, several intermediate procedural steps, including ones involving public comment, remained for the agency to take before the substantive harm alleged by plaintiffs could become concrete.  Thus, opportunity remained for plaintiffs to remedy the

7

perceived harm at the administrative level prior to implementation.  In contrast, the agency in this case is implementing the new trail classification system and accompanying design parameters. Even if plaintiff can contest a specific trail classification, it will have no further opportunity to participate in the formulation of the design parameters themselves.  Third, because plaintiffs in *Ohio Forestry* were mounting a substantive challenge to the Plan, further factual development would be of assistance to the Court in ascertaining the scope of the alleged harm.  Here, plaintiffs are not seeking a specific substantive outcome, but rather an opportunity to participate in the administrative process.  Thus, further factual development does not serve the same purpose in this case as it did in *Ohio Forestry*.  The Court therefore finds BCHA's claims ripe for review and will proceed to the merits.

## III.    BCHA's Challenge Under Section 14 of NFMA

BCHA's first argument is that the agency's failure to solicit public comment before implementing the new trail classification system violated Section 14 of NFMA, 16 U.S.C. § 1612.  (Pl.'s Mot. at 8-15.)  That provision requires the Forest Service to "establish procedures . . . to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards, criteria, and guidelines applicable to Forest Service programs."  16 U.S.C. § 1612(a). The agency's regulations define "standards, criteria, and guidelines" as "written policies, instructions, and orders, originated by the Forest Service and issued in the Forest Service Manual which establish the general framework for the management and conduct of Forest Service programs."  36 C.F.R. § 216.2(c).  The regulations further state that the public participation

equirements of Section 14 do not apply to "[i]nstructions, procedures, and other material issued in Forest Service Handbooks."  36 C.F.R. § 216.3(a)(2).[3]

The Forest Service makes three arguments to support its position that implementation of the new trail classification system did not trigger the public participation requirements of section 1612.  First, it argues that the trail classification system was not published in the Forest Service Manual, and therefore it automatically falls outside the regulatory definition of "standards, criteria, and guidelines" found at 36 C.F.R. § 216.2(c), thereby eliminating the need for notice and comment.  (Def.'s Mot. at 22.)  The agency claims that its regulations are entitled to *Chevron* deference. (Def.'s Reply at 8 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 845 (1984)).)  Under step one of *Chevron*, "if the intent of Congress is clear," the Court "must give effect to [that] unambiguously expressed intent."  *Chevron*, 467 U.S. at 842-43. When statutory language admits of some ambiguity, however, the Court "must defer to the agency's interpretation of the ambiguous statutory term if it 'represents a reasonable

---

[3]Notably, the regulations do not provide a definition of a "Forest Service program."  At one time, the regulations defined "program" as "land and resource activities, or combinations of them, conducted by the Forest Service."  36 C.F.R. § 216.1 (1983).  This section was revised, and the definition was eliminated in 1984.  49 Fed. Reg. 16991-16994 (April 23, 1984); *see also Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1519 (9th Cir. 1985).  Nevertheless, it is clear that the Forest Service's maintenance of the National Trail System constitutes a "Forest Service program" within the meaning of NFMA.  For instance, in *Oberson v. United States*, 311 F.Supp.2d 917 (D. Mont. 2004), the court discussed the "Forest Service process of identifying hazards on trails" as one aspect of "the Gallatin National Forest trail program."  *Id*. at 939. Similarly, another district court noted that "the Forest Service adopted [a] land management plan [that] had as one of its many goals the designation *at the program level* of . . . 338 miles of equestrian/hiker trails."  *Shawnee Trail Conservancy v. Nicholas*, 343 F.Supp.2d 687, 691 (S.D. Ill. 2004) (emphasis added).  Moreover, while the agency argues that the new TCS does not constitute "standards, criteria and guidelines" under 16 U.S.C. § 1612(a) (Def.'s Mot. at 22), or "the general framework for the management and conduct" of a Forest Service Program (Def.'s Mot. at 22-23), at no point does the agency contest that the National Trail System is, in fact, a "program" within the meaning of both NFMA and its accompanying regulations.

accommodation of the conflicting policies that were committed to the agency's care by the statute.'" *New York v. E.P.A.*, 413 F.3d 3, 23 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 845).

Since the phrase "standards, criteria, and guidelines" is ambiguous, under step two of *Chevron* the Court must consider the reasonableness of the distinction drawn in the agency's regulations between the Forest Service Manual and the Forest Service Handbook. Even granting deference under *Chevron*, however, the agency's choice of publication cannot, by itself, immunize the agency from the statutorily mandated requirement of notice and comment. Importantly, 16 U.S.C. § 1612 does not distinguish between materials published in the Manual and those published in the Handbook. Rather, it mandates notice and comment for all "standards, criteria, and guidelines applicable to Forest Service programs." 16 U.S.C. § 1612(a). The agency provides no reasoned explanation for how it distinguishes between "instructions . . . issued in the Forest Service Manual," 36 C.F.R. § 216.2(c), which are subject to notice and comment, and "instructions . . . issued in the Forest Service Handbook," 36 C.F.R. § 216.3(a)(2), which are not. The preamble to 36 C.F.R. § 216 states that materials published in the Forest Service Handbook "contain detailed instructions to FS technicians and specialists for carrying out the policy and direction in the FS Manual." 49 Fed. Reg. 16991. But "policy and direction" is not synonymous with "standards, criteria, and guidelines," as used in 16 U.S.C. § 1612(a). Moreover, by publishing only generalized "policy" in the Forest Service Manual, and "detailed instructions" in the Handbook, 49 Fed. Reg. 16991, the agency effectively avoids the need for notice and comment regarding the substantive standards by which Manual policies are

implemented.[4]  This is not to say that every matter published in the Handbook requires notice

and comment, but rather than the agency has not articulated a reasoned explanation for which

material should or should not fall within the definition of "standards, criteria, and guidelines."

At a minimum, the agency cannot use its regulations to avoid statutorily mandated notice and

comment.  *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 322-23 (D.C. Cir. 1987).  Nor can it

promulgate regulations that are inconsistent with its statutory mandate.  *See, e.g., Ctr. for Auto*

*Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) (invalidating regulation as

"fatally inconsistent" with statutory command).  Thus, what is controlling is not whether the new

trail classification system was published in the Forest Service Handbook or Manual, but rather,

whether the agency action constitutes "the formulation of standards, criteria, and guidelines

applicable to Forest Service Programs," within the meaning of 16 U.S.C. § 1612(a).

---

[4]Of additional concern, the agency appears to have deviated, at least to a limited extent, from past practice with respect to the inclusion of trail classification information in the Forest Service Manual.  While the prior trail classes – primary, secondary and way – are contained in the Forest Service Handbook (*see* AR 168), the difficulty levels are defined and published in the Forest Service Manual.  (*See* AR 11, 13, 31 ("Difficulty is a function of trail condition and route location factors such as alignment, steepness of grades, gain and loss of elevation, availability of drinking water, and amount and kind of natural barriers that must be crossed.").) The Handbook, recognizing that "[d]ifficulty level has design implications" (AR 58), fleshes out how to assign difficulty levels to specific trails. (*See* AR 63 (categorizing difficulty levels according to grade (steepness), clearing width and height, tread width and trail surface material).)  According to the agency, the "Design Parameters are an associated management tool and are an update of the old difficulty level."  (AR 164.) Yet, despite the fact that the "Design Parameters are currently undergoing agency-wide application and validation" (AR 81), the agency appears to have updated neither the Forest Service Manual nor the Forest Service Handbook to reflect the new trail classification system and design parameters. (*See* AR 18-38 (current Manual) and AR 39-79 (current Handbook).)  Two problems with the agency's approach are apparent.  First, the Forest Service Manual and Handbook, which still reference "Difficulty Levels" (AR 31, 40), are now inconsistent with the Forest Service's current policies regarding trail classes and design parameters.  Second, to the extent that the agency intends to wait to update the Forest Service Manual and Handbook until it has fully implemented the new trail classification system, the intended benefits of public notice and comment will have been lost.

Second, drawing on the definition of "standards, criteria, and guidelines" found in the regulations, the agency argues that the trail classification system does not provide a "general framework for the management and conduct of a Forest Service program."  (Def.'s Mot. at 22-23.)  Rather, according to the agency, it provides "necessary specialized technical guidance" to implement the Inventory Record instruction found in the Forest Service Manual.  (FSM § 2353.14; AR 32.)  That provision directs the agency to "[i]nventory all trail facilities" through use of "a data management system that allows for the storage, manipulation, and upward reporting of the data."  (FSM § 2353.14; AR 32.)  But the new trail classification system, when combined with the new design parameters, does more than permit the "upward reporting of data" (FSM § 2353.14; AR 32); it results in the dissemination downward to local managers of trail maintenance standards that "provide guidance for the assessment, survey and design, construction, repair and maintenance of trails, based on the Trail Class and Designed Use of the trail."  (AR 94-102.)  In fact, the "Design Parameters represent a standardized set of commonly expected construction and maintenance specifications" from which local deviation is permitted only if "the variations continue to reflect the general intent of the national Trail Classes."  (AR 86.)  Such imperatives move beyond mere data management into the realm of "written policies . . . which establish the general framework for the management and conduct of Forest Service programs."  36 C.F.R. § 216.2(c).   Despite the fact that the managed uses and designed use of any given trail remain controlled by the local forest management program (AR 165), and local trail managers may deviate from the parameters when necessary (AR 86), the new design parameters institute a baseline for trail maintenance decisions. (AR 81 (design parameters constitute "nationally standardized trail specifications").)  Indeed, the agency recognized the dual

12

purpose served by the new trail classification system while it was still in development. (*See* AR 1174 (the revisions were made with "two goals in mind: First, to provide an effective and efficient tool that is useful for trails managers at all levels of the agency, with an emphasis on local program managers.  Second, provide accurate and accountable data to meet a variety of planning and upward reporting needs.").)

Understood in this way, the design parameters serve more than just the Forest Manual's Inventory Directive (FSM § 2353.14, AR 32); they also implement Manual directives to local agency staff to "[m]anage National Forest System trails to carry out the objectives and direction established in the Forest Plans" (FSM § 2353.03, AR 27), to "manage each trail to meet the objective(s) developed for that trail or network of trails" (FSM § 2353.19, AR 33), and to "design the trail for the mode of travel requiring the most demanding construction specifications."  (FSM § 2353.2, AR 33.)  Given the Forest Service's intention that the new trail classification system and design parameters function as a "tool [for] local program managers" (AR 1174), and "guide the trail manager's decision-making process" (AR 81), the agency's action falls within the ambit of "written policies, instructions or orders . . . which establish the general framework for the management and conduct of Forest Service programs,"  36 C.F.R. § 216.2(c), or more generally, of "standards, criteria, and guidelines applicable to Forest Service programs."  16 U.S.C. § 1612(a).

Third, the Forest Service asserts that the new design parameters "have no on-the-ground impact on pack and saddle stock use and do not change the management direction of NFS trails."  (Def.'s Mot. at 23.)  Even assuming that the agency is correct that there will be no changes on the ground, the relevance of that fact within the context of the statutory scheme is minimal.  Section

14 of NFMA speaks only of "an opportunity to comment upon the formulation of standards, criteria, and guidelines applicable to Forest Service programs." 16 U.S.C. § 1612(a). It makes no mention of the *effect* of those standards, criteria or guidelines. By way of contrast, under another provision of NFMA, the agency's action requires "public involvement" only where an amendment to a land and resource management plan "would result in a significant change in such plan." 16 U.S.C. § 1604(f)(4). The agency's belief "that use of the Trail Class Matrix and the associated matrices will [not] impact use of the trails system," and its intention "not . . . to change the use of trails nor the physical characteristics of trails" (AR 166), is not dispositive of the question of whether it is formulating "standards, criteria and guidelines." Nor does the fact that local trail managers may deviate from the design parameters, as long as "the variations continue to reflect the general intent of the national Trail Classes" (AR 86), aid the agency's case. The design parameters still provide the default standards from which the local trail manager must justify a departure. Therefore, by implementing a new trail classification system that involves discretionary decision-making by local trail managers, whose future trail maintenance decisions will be guided by revised design parameters, the agency has formulated "standards, criteria and guidelines applicable to Forest Service programs," 16 U.S.C. § 1612(a), even if the ultimate effect on the ground turns out in fact to be minimal or non-existent. As such, the agency's failure to provide the public notice and an opportunity to comment prior to implementing the design parameters was contrary to 16 U.S.C. § 1612.[5]

_____

[5] The Court's finding that the agency was required to follow notice and comment procedures under 16 U.S.C. § 1612 moots the plaintiff's arguments under 16 U.S.C. § 1604. Therefore, the Court need not express any opinion on the merits of that claim.

**V.     BCHA's NEPA Challenge**

Under NEPA, federal agencies must "examine the environmental effects of proposed

federal actions and . . . inform the public of the environmental concerns that were considered in

the agency's decisionmaking."  *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d

1144, 1150 (D.C. Cir. 2001).  In particular, NEPA requires that agencies prepare an

environmental impact statement ("EIS") for "major Federal actions significantly affecting the

quality of the human environment."  42 U.S.C. § 4332(2)(C).  In order to determine whether a

full EIS is required, agencies may prepare a shorter document, known as an environmental

assessment ("EA").  40 C.F.R. §1508.9(b).  It is undisputed that the Forest Service did not

prepare either an EA or an EIS prior to implementing the new trail classification system.  (Def.'s

Answer ¶ 61.)  Moreover, the agency does not argue that NEPA does not apply to actions

undertaken by the Forest Service.  (Def.'s Br. at 29-34.)  Rather, the agency claims that the

development and implementation of the new TCS falls within a "categorical exclusion" ("CE")

promulgated by the agency and is therefore exempt from preparation of an EIS or EA.  40 C.F.R.

§ 1508.4.  (Def.'s Br. at 30.)  A CE is "a category of actions which do not individually or

cumulatively have a significant effect on the human environment."  *Id.*; *see also* 40 C.F.R.

§ 1507.3.

Promulgating a CE requires an agency to comply with specific procedures established by

the Council on Environmental Quality ("CEQ"), the administrative agency charged with

implementing NEPA.  *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501-1508.  Once

established, however, an agency's "decision to classify a proposed action as falling within a

particular categorical exclusion will be set aside only if a court determines that the decision was

arbitrary and capricious." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d
1012, 1023 (10th Cir. 2002); *see also Citizens Against Rails-to-Trails*, 267 F.3d at 1151 n.5.
Furthermore, the agency's interpretation of the scope of one of its own CE's is "given controlling
weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Alaska
Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999); *see also W. Houston Air
Comm. v. F.A.A.*, 784 F.2d 702, 705 (5th Cir. 1986); *City of Alexandria v. Fed. Highway Admin.*,
756 F.2d 1014, 1020 (4th Cir. 1985).

The Forest Service asserts that the development and implementation of the new TCS falls
within the categorical exclusion for "[r]ules, regulations or policies to establish Service-wide
administrative procedures, program processes, or instructions."  57 Fed. Reg. 43180; FSH
§ 1909.15, ch. 31.1.  Examples of this CE are defined in the Handbook as "[p]roposing a
technical or scientific methodology or procedure for screening effects of emissions on air quality
related values in Class I wildernesses;" and "[e]stablishing a Service-wide process for responding
to offers to exchange land and for agreeing on land values."  *Id*.  Plaintiff argues that the Forest
Service's assertion of a CE is a "post-hoc" rationalization because there was "no documentation"
relating to the basis for the agency's decision.  (Pl.'s Mot. at 16.)  Such an argument fails because
the CE in question is one for which "no decision memorandum is required."  57 Fed. Reg. 43180;
FSH § 1909.15, ch. 31.12.  Therefore, the agency had no obligation to formally document its
decision.  Plaintiff next argues that, at the time implementation of the new TCS began, Forest
Service regulations prohibited the use of CE's with respect to wilderness areas, steep slopes and
other specified geographic areas. (Pl.'s Mot. at 17 (citing 67 Fed. Reg. 54622-23 (Aug. 23,
2002).)  The regulation on which plaintiff relies, however, explicitly notes that "the mere presence

16

of these resource conditions does not necessarily preclude use of a categorical exclusion." 67 Fed. Reg. 54623.  Rather, "if uncertainty exists over the significance of environmental effects, a categorical exclusion would not be appropriate." *Id*.

Thus, the critical issue is the reasonableness of the agency's conclusion that the new trail classification system and design parameters "has no impact on the environment." (Def.'s Mot. at 32.)  The agency contends that the "TCS is an internal inventory and information management tool. . . .  Trail classification, under both the prior and current systems, is driven by the development scale of the trail and preexisting direction in the land management plan, travel management plan, and trail-specific decisions."  (Def.'s Mot. at 33 (citing AR 1529).)  Plaintiff counters that "[b]ecause the new TCS applies to all trails within the National Forest System lands on a nationwide basis, . . . it thereby constitutes a major federal action significantly affecting the quality of the human environment." (Pl.'s Mot. at 18.)  This argument obviously fails because it is not the scope of the agency action, but rather whether it "significantly affect[s] the quality of the human environment" that determines whether an EA or EIS is required.  42 U.S.C. § 4332(2)(C).

In its reply, plaintiff advances yet another argument; namely, that the design parameters "are the active maintenance criteria for trails, and thus directly determine the level of physical maintenance which will occur on a trail."  (Pl.'s Reply at 15.)  It is difficult at this stage to determine what effect, if any, the new trail classification system will have on the ground.  The agency's position is that the new TCS cannot have a significant effect on the environment because trail managers were instructed to apply trail classifications based on existing conditions and the current management plan for that trail.  (*See* AR 334, 1529, 2097.) Therefore, the agency

17

argues, "physical trail characteristics on the ground have not changed, and the Trail Class Matrix will not change the characteristics." (AR 164.)  Based on the record, the Court cannot find that this assessment by the Forest Service is arbitrary and capricious.  The environmental impact of the new TCS will depend upon local trail managers' decisions with respect to the classification and maintenance of trails under the new system.  Given the Forest Service's efforts to design a new system that reflects more accurately the current condition of the National Trail System, without altering it (AR 166), the Court is not in a position to second-guess the success of the agency in doing so.  Therefore, the Court will deny plaintiff's motion for summary judgment with respect to its claim under NEPA.

## CONCLUSION

For the foregoing reasons, the Court will grant plaintiff's Motion for Summary Judgment in part and deny it in part, and will grant defendant's Cross-Motion for Summary Judgment in part and deny it in part.  The case is remanded to the United States Forest Service for further proceedings consistent with this Memorandum Opinion.  An appropriate Order accompanies this Memorandum Opinion.

                                              s/
                                 ELLEN SEGAL HUVELLE
                                 United States District Judge

Date:  March 29, 2006

18